UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JAHQUAN SPENCER,

                         Plaintiff,

              -against-

LABORATORY CORPORATION OF AMERICA
HOLDINS, GLENNETTE CYRUS &
ARACELI REYES,

                         Defendants.
-------------------------------------------------------------------X

For Online Publication Only

FILED
CLERK
10:54 am, Aug 06, 2024
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM AND ORDER**
19-CV-04927 (JMA) (ARL)

**AZRACK, United States District Judge:**

       Pro se plaintiff Jahquan Spencer ("Spencer" or "Plaintiff") commenced this diversity action on August 28, 2019 against Laboratory Corporation of America Holdings ("LabCorp") and Psychemedics Corporation ("Psychemedics"). Following the Court's November 30, 2020 dismissal of Psychemedics, (ECF No. 36), Spencer filed a second amended complaint on March 18, 2022 asserting state law claims for fraud, fraudulent concealment, intentional infliction of emotional distress and negligence against LabCorp and two newly added individual defendants Glennette Cyrus ("Ms. Cyrus") and Araceli Reyes ("Dr. Reyes") (collectively, with Omega, the "Defendants"). (Second Amended Complaint ("SAC"), ECF No. 60.) Before the Court is Defendants' motion to dismiss the SAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Defs.' Mot. to Dismiss, ECF No. 67.) For the reasons discussed below, the Court grants Defendants' motion and dismisses Spencer's SAC with prejudice for failure to state a claim.

## I.  BACKGROUND

### A.  Factual Background

#### 1.  Overview

This is one of five cases that Spencer has brought against various entities involved in drug tests he and his girlfriend Bernadine Cooley ("Cooley") took in connection with child abuse proceedings that were brought against Spencer and Cooley (collectively, the "Parents") in Suffolk County Family Court ("Family Court").

In addition to the instant matter where LabCorp is a defendant, Spencer has a related case that is also pending before the undersigned in which Spencer, Cooley, and their minor children brought suit against a different testing laboratory, Omega Laboratories, which was also involved in drug tests connected to the Parents' Family Court Proceeding.  Spencer et al v. Omega Laboratories Inc. et al, No. 20-cv-03747 (JMA) (E.D.N.Y) (hereinafter the "Omega Case").  As in the instant case, Omega and the individual defendants named in the Omega Case filed a motion to dismiss the operative pleading in that case.  (First Amended Compl. (hereinafter the "Omega Complaint"), Spencer et al v. Omega Laboratories Inc. et al, No. 20-cv-03747 (E.D.N.Y), ECF No. 24.)  The Court is granting that motion to dismiss in a Memorandum & Order (the "Omega Decision") that is being filed concurrently with the instant decision.  The Court assumes familiarity with both the Omega Decision as well as the Court's November 30, 2020 Order that granted Psychemedics' motion to dismiss.  Spencer v. Laboratory Corp. of Am. Holdings, No. 19-CV-04927, 2020 WL 7024381 (E.D.N.Y. Nov. 30, 2020).

The facts set out below are taken from the SAC and the exhibits which are attached or

integral to that pleading.  See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004).[1]

According to the SAC and the Omega Complaint, Spencer tested positive for cocaine on four different hair tests between November 2017 and September 2018.  LabCorp and Psychemedics were only involved in Spencer's August 28, 2018 hair test.  Spencer's other three hair tests—which occurred on November 27, 2017, September 13, 2018, and September 26, 2018—were performed by Omega.  In addition to Spencer's positive hair tests, Cooley tested positive for cocaine on two separate hair tests that Omega performed in November 2017 and July 2018.  Additionally, as noted in the Omega Decision, Plaintiffs' opposition brief in that case also indicates that, on November 22, 2017, one of the minor children tested positive for cocaine.

Spencer and Cooley nevertheless insist in both cases that they do not use any drugs and allege that each of their positive hair tests were false positives that were fraudulent, tampered with, and/or negligently administered in some fashion.  (SAC ¶ 15.)  In addition to their insistence that they do not use drugs, the pleadings in both cases allege that the Parents took urine tests that were negative for cocaine and that Cooley took a hair test in August 2018 that Omega reported as "negative" for cocaine.[2]

---

[1]   The allegations in the Omega Complaint and the pleadings filed by Plaintiffs in other related cases constitute admissions of which the Court can take judicial notice and can consider here.  See Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) (taking judicial notice of guilty plea and noting that "[t]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records.") (quoting 21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5106 at 505 (1977)); In re FedEx Ground Package Sys., Inc., Emp. Pracs. Litig., No. 305-MD-527, 2010 WL 1253891, at *1 (N.D. Ind. Mar. 29, 2010) (stating that "[c]ourt documents from another case may be used to show that the document was filed, that [a] party took certain position, and that certain ... admissions were made" and taking judicial notice of admission defendant made in court filing) (emphasis added); Flint v. Beneficial Fin. I Inc., No. 12-CV-01675, 2012 WL 3277109, at *3 (E.D. Cal. Aug. 9, 2012) (taking judicial notice of admission by plaintiff in pleading filed in another case).  Even if the Court were to not consider the Omega Complaint, the Court would still find, based on the SAC alone, that Spencer has not alleged any plausible claims here.

[2]   As explained in the Omega Decision, while Cooley's August 2018 hair test was reported as "negative," the testing documentation for this test—which is attached to the Omega Complaint—indicates that cocaine was also detected in this hair sample, albeit at a level below the cutoff for reporting a positive test.

In both cases, Spencer also points to, among other things, various alleged discrepancies in the testing documentation that he has submitted as exhibits to the pleadings, including copies of the Custody and Control Forms ("CCF") that are used to document the chain of custody for drug testing samples.

## 2. Child Abuse Proceeding and the Parents' Court-Ordered Drug Tests in November 2017 and July 2018

In November 2017, Spencer and Cooley were required to complete court-ordered urine and hair drug tests administered by the EAC Network/TASC ("EAC").  (SAC ¶¶ 14, 20.)  Although their urine tests were negative for cocaine, both of their hair tests were positive for cocaine.  (SAC ¶¶ 14.)  As a result of these positive drug tests, their children were removed from their custody.  (SAC ¶ 13.)  According to the SAC, "[a]t no time prior to the test or after the test did plaintiff or Ms. Cooley use any drugs any time."  (SAC ¶ 15.)

In December 2017, Spencer and Cooley agreed to attend drug programs.  (SAC ¶ 52.) Cooley graduated from her drug program on July 9, 2018.  (SAC ¶ 54.)

The SAC alleges that between November 2017 and July 15, 2019, Spencer and Cooley tested negative for all substances on urine tests that were performed at drug programs and through Family Court.  (SAC ¶¶ 51.)  The SAC, however, does not identify the specific number of urine tests Spencer took or the dates when all these urine tests occurred.[3]  (SAC ¶¶ 20, 51.)

On July 10, 2018, Cooley filed a petition for unsupervised visitation rights and was requested by Suffolk County CPS to perform a hair test.  (SAC ¶ 55.)  On July 11, 2018, EAC collected her hair sample, which was supposed to be sent to Omega for testing.  (SAC ¶¶ 56–61.) While Omega normally reports hair test results within two to three days, Omega did not report that

---

[3] The Omega Complaint identifies various urine drug tests Spencer took between March 7, 2019 and May 29, 2019. (Omega Compl. ¶ 47, Ex. D.)

Cooley's sample was positive until August 14, 2018.  (SAC ¶ 61.)  Cooley did not learn about this positive result until she attended a Family Court hearing on August 28, 2018.  (SAC ¶ 61.)

On August 17, 2018, Cooley paid for a private hair test through Rabu Diagnostic Service ("Rabu") in order to protect herself "against false positive results in" Family Court.  (SAC ¶ 62.)  On August 22, 2018, Omega reported that Cooley's August 17, 2018 hair test was negative for all substances.  (SAC ¶ 62.)

At the August 28, 2018 hearing, Cooley submitted her negative test to the Family Court and "requested to dispute" her positive July 2018 hair test based on her negative August 17, 2018 hair test.  (SAC ¶ 63.)  According to the SAC, the Family Court "granted" that request.  (SAC ¶ 63.)

The SAC alleges that, at some unspecified point, Spencer was "requested" to take another hair test and he "agreed," but told the Family Court that he would only do so after "Cooley disput[ed]" her July 2018 hair test.  (SAC ¶ 63.)  Spencer then sought to obtain a "private hair test to protect himself [from] any false positive test in" Family Court.  (SAC ¶ 63.)

Spencer and Cooley believed that their November 2017 and July 2018 hair samples that EAC had collected (and which had all tested positive for cocaine) were "being tampered with/falsified, and or either there was a breach in the chain of custody such that the samples were never truly shipped by E.A.C. or received by Omega."[4]  (SAC ¶ 32.)

### 3.  Spencer's Positive Hair Tests in August and September 2018

On August 28, 2018, Spencer went to Rabu and paid for a private hair test that, according to a Rabu employee, would be performed by LabCorp.  (SAC ¶ 29.)  On September 4, 2018, Rabu

---

[4]  The Parents sued EAC in state court concerning these tests, alleging negligence and fraud.  In September 2021, the state court granted EAC's motion to dismiss.  Spencer v. EAC Network, Index No. 03870/2019 (N.Y. Supreme Court, Suffolk County).

provided Spencer with a LabCorp report dated September 1, 2018 (the "September 1 LabCorp Report") which indicated that his hair sample had tested positive for cocaine.  (SAC, Ex. 1.)  The SAC alleges that this result was a false positive and that the September 1, 2018 LabCorp Report (and the positive result reported therein) was "phony" and "inauthentic."

The SAC contains further details concerning Spencer's August 2018 hair test, which are discussed in greater depth below.  The SAC, however, omits the fact that—as detailed in the Omega Complaint and its attached exhibits—Spencer also underwent two additional private hair tests through Omega on September 13, 2018 and September 26, 2018 and that Omega reported both of these were also positive for cocaine.[5]  (Omega Complaint ¶¶ 79–82, Exs. F, H.)  According to Spencer's pleadings this case and in the Omega Case, these three hair tests—which were taken within a month of each other—were all, somehow, false positives.[6]

Spencer never provided any of these three hair tests to the Family Court and his pleadings do not indicate that the Family Court ever learned of (or relied on) these three positive hair tests.

### 4.  Details of Spencer's August 2018 Hair Test

When Spencer went to Rabu on August 28 to provide his hair sample for that test, Spencer had initially requested that his specimen be sent to Omega for testing.  However, due to a computer glitch, he had to choose LabCorp to perform his hair test instead.  (SAC ¶¶ 29, 65, 66.)  Spencer's hair specimen was collected by Rabu and placed in a "LabCorp" specimen sealed pouch.  (SAC

---

[5] The test reports and litigation packages for Spencer's August and September 2018 hair tests suggest that the samples collected for these tests were shorter in length than the 1.5-inch samples collected for Cooley's hair and that, as such, Spencer's hair tests likely did not cover a full 90-day time period.  (SAC, Ex. 3 at 05 (noting sample length of "0 to 2.2cm); Omega Complaint, Ex. M (Sept. 13, 2018 Omega test of .5 inch sample); Omega Complaint, Ex. J (Sept. 26, 2018 Omega test of 1.25 inch sample).)

[6]  In the Omega Decision, the Court granted the defendants' motion to dismiss and concluded, inter alia, that Spencer failed to plausibly allege that Omega acted negligently in performing these two additional hair tests in September 2018.

¶¶ 30, 67; SAC, Ex. 3 at 07.)  As requested by Rabu, Spencer printed his initials on the sealed pouch and signed the CCFs.  (SAC ¶¶ 30, 67; SAC, Ex. 2, Ex. 3 at 06–07.)  The CCFs for this hair test contain the "LabCorp" logo at the top of the form and list four different addresses for LabCorp. (SAC, Exs. 2, 3 at 06.)  Rabu then provided Spencer with a "Donor Copy" of the CCF.[7]   (SAC ¶ 67.)  An employee at Rabu told Spencer that his specimen would be shipped to and tested by LabCorp.  (SAC ¶ 67.)

On September 4, 2018, Spencer was contacted by a medical review officer from "D.R.S. Medical Review Service" ("DRS") who asked Spencer if he had been taking any prescription medications around the time of his August 28, 2018 hair collection.  (SAC ¶ 69.)  Spencer denied taking any prescriptions.  (SAC ¶ 69.)  That same day, Rabu emailed Spencer a DRS report indicating that his hair test was positive.  (SAC ¶ 70; SAC, Ex. 7.)  Later that day, Rabu also sent Spencer a copy of the September 1 LabCorp Report which states that the test was positive and also includes the quantitative levels of cocaine and benzoylecgonine detected by the test.  (SAC ¶¶ 32, 70, Ex. 9.)

The September 1 LabCorp Report indicates that three tests were "Ordered":  "#806705-hair corporate, #806766-cocaine conf hair and #070466-chain of custody protocol."  (Id.)

On October 17, 2018, Rabu sent Spencer another report from the DRS medical review officer.  The next day, Rabu also sent Spencer a copy of the "Collector Copy" of the CCF for this test, which contains Spencer's signature.  (SAC, Ex. 2.)

On October 29, 2018, Spencer went to Rabu to file a complaint, stating that he believed that his sample had been tampered with or his results were falsified.  (SAC ¶ 34.)  Rabu instructed him to request a litigation package from LabCorp.  (SAC ¶¶ 35, 75.)  On November 1, 20118,

---

[7]  While the SAC includes, as exhibits, the "Collector Copy" and the "Laboratory Copy" of the CCF for the August 2018 hair test, Spencer did not include the "Donor Copy" that he admittedly received.

Spencer spoke to a LabCorp employee, defendant Glennette Cyrus, who told Spencer that for $250 he could order a litigation package which "would pull everything that happened at the lab."  (Id. ¶¶ 36, 38.)  On this call, Spencer also asked Cyrus if LabCorp "perform[ed] and report[ed]" the three tests listed on the September 1 LabCorp Report.  (SAC ¶ 37.)  According to the SAC, Cyrus represented that LabCorp "performed/reported" all three tests.  (SAC ¶ 38.)

That same day, Spencer paid his attorney $250 to request the litigation package from LabCorp for the August 28 hair test.  (SAC ¶¶ 39, 40, Ex. 3.)  On November 20, 2018, Spencer received the requested litigation package.[8]  (SAC ¶ 38.)  The litigation package he received was not prepared by LabCorp.  (SAC, Ex. 3.)  Rather, it was prepared by Psychemedics and indicates that Psychemedics—rather than LabCorp—performed the actual testing.  (Id.)  According to the litigation package, LabCorp was only the Third-Party Administrative Provider ("TPA") for this hair test and did perform the actual testing.  (Id.)  The litigation package indicates that LabCorp subcontracted out the actual testing of this sample to Psychemedics, which prepared its own report with the test results and then reported those results to LabCorp.  (Id.)

The litigation package states that when Spencer's specimen was accessioned at Psychemedics on August 30, 2018, both the tamper-evident integrity seal on the collection pouch (initialed and dated by the test subject) and the primary specimen bottle seal was intact.  (Id. at 4, 7.)  According to the litigation package and Pyschemedics' report, Spencer's sample was found, in the initial screening test, to be presumptively positive for cocaine.  (Id. at 3–6.)  Spencer's sample was then subjected to confirmatory testing, which found a level of cocaine above the cutoff for a positive result.  (Id.)  The quantitative test results reported in the litigation package, the

---

[8] A litigation package contains a certification, explains how the tests were performed and the results, and also includes extensive testing documentation including a copy of the CCF, a picture of the seal for the sample that the donor has initialed, and internal laboratory chain of custody paperwork.  A copy of the litigation package for Spencer's August 28 hair test is attached to the SAC.  (SAC, Ex. 3.)

September 1 LabCorp Report, and the DRS Reports are all consistent and all indicate that Spencer tested positive for cocaine.

When Spencer received the litigation package, he was confused because Rabu never told him that Psychemedics was going to perform the hair test and because the September 1 LabCorp Report was not in the litigation package.  (SAC ¶ 41.)  Spencer maintains that Pyschemedics' litigation package is "fraudulent" and part of an elaborate fraud perpetrated by LabCorp and Psychemedics.

As noted earlier, the September 1 LabCorp Report indicates that three tests were "Ordered":  "#806705-hair corporate, #806766-cocaine conf hair and #070466-chain of custody protocol."  (SAC, Ex. 1.)  During Spencer's November 1, 2018 call with Cyrus, he asked her if LabCorp "perform[ed] and report[ed]" the three tests listed on the September 1 LabCorp Report.  (SAC ¶ 37.)  According to the SAC, Cyrus represented that LabCorp "performed/reported" all three tests.  (SAC ¶ 38.)

When Spencer spoke to different LabCorp employees on November 27, he was told that the only tests ordered and performed by LabCorp were "806705" and "070466," and that "806766" was "an old test code" that LabCorp no longer performs.  (SAC ¶ 42.)  Spencer contends that this conversation shows that the September 1 LabCorp Report "was inauthentic and not factually true."  (SAC ¶ 86.)

As discussed further infra, Spencer also points to various purported discrepancies, omissions, and irregularities in the testing documentation found in the litigation package that he claims support his negligence and fraud claims.

### 4.  Other LabCorp Tests in the Record

On August 17, 2018, Spencer took a urine test for the New York City Taxi and Limousine Commission ("TLC").  (SAC, Ex. 4.)  This urine sample was collected by LabCorp and not a third party.  (SAC, Ex. 4 at 6.)  The next day, LabCorp reported that this urine test was negative for all substances.  (Id.)  In January 2019, Spencer ordered the litigation package for this test, which include a copy of the "Patient Report" for this test.  (SAC, Ex. 4.)

On January 16, 2019, Cooley took a private hair test through LabCorp.  (SAC, Ex. 5.)  For this test, LabCorp collected her hair sample.  (SAC ¶ 44; Pl. Opp'n at 5, ECF No. 68.)  On January 18, 2019, LabCorp issued a "Patient Report" stating that this test was negative for all substances. (Id.)  Spencer insists that Cooley's January 2019 hair test—which occurred more than four months after her earlier hair tests in July and August 2018—is accurate.  Notably, this "Patient Report" indicates that Psychemedics was also involved in the testing of Cooley's hair sample and undermines Spencer's suggestion that Psychemedics' role in his August 28 hair test was somehow irregular or abnormal.  Cooley's January 2019 LabCorp test—which Spencer maintains was accurate—confirms that LabCorp subcontracted out hair testing to Psychemedics.[9]

The "Patient Reports" LabCorp issued for these two tests in January 2019 differ, in certain respects, from the September 1 LabCorp Report.  The Patient Reports have different formatting and also contain certain information that is not found on the September 1 LabCorp Report.  Based on these differences, Spencer alleges that the September 1 LabCorp Report is "phony."  (SAC ¶ 76.)

---

[9]  Spencer stresses the fact that:  (1) the specimen pouch and CCF he signed for his August 28 hair test have LabCorp logos; (2) the CCF for this test contains various addresses for LabCorp; and (3) the CCF does not mention Psychemedics by name.  The SAC, however, does not allege that the CCFs and specimen pouch that Cooley signed for her January 2019 hair test were different than the CCFs and specimen pouch used for Spencer's August 28 hair test.  The Court also notes that despite the fact that numerous other CCFs are attached Spencer's pleadings, the SAC does not include a copy of the CCFs for Cooley's January 2019 hair test.

### 5.  Proceedings in Family Court

The SAC provides few additional details about the Family Court proceedings that occurred after the August 28 hearing.  The SAC generally asserts that Spencer refused to take a hair test ordered by the Family Court at some point between September 1, 2018 and July 17, 2019 as was punished for this refusal.  (SAC ¶ 119.)

The Omega Complaint fills in some of these missing details.  According to the Omega Complaint, the Parents refused to take court-ordered hair tests at a hearing held on October 15, 2018, which led the Family Court to draw an adverse inference against them.  (Omega Complaint ¶¶ 32–34.)  The Omega Complaint also explains that, on October 25, 2018, the Family Court held a hearing concerning Cooley's August 17, 2018 hair test.  (Id. ¶¶ 32–34.)  According to the Omega Complaint, at the end of the October 25 hearing, the Parents were ordered to complete additional mental/drug evaluations and to undergo additional hair tests.  (Id. ¶ 42.)  The Parents, however, again refused to take these court-ordered hair tests.  (Id. ¶¶ 42, 44–45.)

The Omega Complaint and the Omega Decision explain the further developments in Family Court, including the Parents' continued refusal to take court-ordered hair tests.

### B.  Procedural Background

On August 28, 2019, Spencer, proceeding pro se, filed a complaint asserting claims of negligent infliction of emotional distress, IIED, and fraud against Psychemedics and LabCorp.  (Compl., ECF No. 1.)  On January 30, 2020, Spencer filed an amended complaint, asserting the same causes of actions against the same defendants.  (Am. Compl., ECF No. 24.)  Defendant Psychemedics filed a motion to dismiss on January 30, 2020 pursuant to Rule 12(b)(6).  (ECF No. 25.)  On November 30, 2020, this Court granted Psychemedics' motion in its entirety.  (ECF No. 36.)

On December 18, 2020, Spencer retained counsel and requested leave to file a second amended complaint.  (ECF No. 40.)  The Court eventually set a deadline of October 15, 2021 for him to file a seconded amended complaint.  On October 15, 2021, Spencer relieved his counsel and two weeks later a new attorney appeared on his behalf.  (ECF Nos. 44, 47.)  On February 16, 2022, the Court informed Spencer that he had to file his second amended complaint within 30 days and set a briefing schedule for LabCorp's proposed motion to dismiss.  (ECF No. 53.)  On March 9, 2022, Spencer dismissed his counsel and informed the Court he would proceed pro se.  (ECF No. 54, 55.)  On March 15, 2022, Spencer, proceeding pro se, filed the SAC, asserting claims of fraud, fraudulent concealment, intentional infliction of emotional distress ("IIED") and negligence against LabCorp, Cyrus, and Dr. Reyes, another LabCorp employee.  (SAC.)  On May 31, 2022, defendants filed the instant fully briefed motion to dismiss.  (ECF No. 67.)

In addition to the Omega Case filed in federal court, the Parents have filed related suits in state court.

In January 2019, the Parents and their children filed suit in New York State Supreme Court, Suffolk County, against EAC, three individual employees of EAC, Omega, and four individual Omega employees.  Spencer v. EAC Network, Index No. 03870/2019 (N.Y. Supreme Court, Suffolk County).  The plaintiffs' complaint and first amended complaint in this state court action alleged claims for fraud, IIED, and negligent infliction of emotional distress based on the Parents' November 2017 and July 2018 hair tests.  After Omega and its employees were dismissed because personal jurisdiction over them was lacking, EAC and its employees then moved to dismiss the complaint.  The plaintiffs opposed the motion and, represented by counsel, sought leave to file a second amended complaint.  The plaintiffs' proposed second amended complaint added claims for negligence and negligent misrepresentation, and abandoned the IIED claim.  In September 2021,

Justice George Nolan granted the EAC defendants' motion to dismiss and denied Plaintiffs leave to file their second amended complaint.  Spencer v. Eac Network, No. 003870/2019, 2021 N.Y. Misc. LEXIS 14609, at *7 (N.Y. Sup. Ct. Sep. 24, 2021).

In August 2019, Spencer filed suit in New York State Supreme Court, Nassau County, against Rabu and DRS concerning his August 28 hair test.  Spencer v. Rabu Diagnostic Services, Index No. 000949/2019 (N.Y. Supreme Court, Nassau County).  Spencer's complaint alleged claims for fraud, IIED, and negligent infliction of emotional distress.  Spencer v. Rabu Diagnostic Services, Index No. 000949/2019, 2020 N.Y. Misc. LEXIS 44501 (N.Y. Supreme Court, Nassau County).  In December 2020, the state court granted summary judgment in favor of the defendants.

Plaintiffs also filed suit in state court against Suffolk County and related defendants concerning the drug test of the minor child who tested positive for cocaine.  Spencer v. County of Suffolk, Index No. 622233/2019.

## II.  DISCUSSION

### A.  Rule 12(b)(6) Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must allege sufficient facts "to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).  Mere labels and legal conclusions will not suffice.  Twombly, 550 U.S. at 555.  In reviewing a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Cleveland v. Caplaw Enters., 448 F.3d 518, 521

(2d Cir. 2006). A court may also consider materials attached to the complaint, materials integral to the complaint, and materials incorporated into the complaint by reference. Sira, 380 F.3d at 67.

While a court is required to read a plaintiff's pro se complaint liberally and interpret it as raising the strongest arguments it suggests, a pro se plaintiff must still plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).

This Court has jurisdiction over Spencer's state law claims based on diversity, pursuant to 28 U.S.C. § 1332. The Court finds that substantive New York law applies to this diversity action and no party argues otherwise.

For the reasons discussed below, the SAC fails to allege plausible claims against the defendants for fraud, fraudulent concealment, negligence, and IIED.[10] Accordingly, the defendants' motion to dismiss the SAC is granted as to all defendants.[11]

## B. **Negligence Claim**

### 1. **Legal Standard and Overview**

A negligence claim under New York law requires: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." Pasternack v. Laboratory Corp. of Am. Holdings, 807 F.3d 14, 19 (2d Cir. 2015). Though generally a contractor "does not owe an independent tort duty of care to a non-contracting third party," Dung Nguyen v. Morrison Healthcare, 412 F. Supp. 3d 196, 202 (E.D.N.Y. 2018), there is an exception

---

[10]   For ease of reading, the Court's discussion below focuses on why the SAC fails to allege plausible claims against LabCorp. Plaintiffs have also sued two individual employees of LabCorp. Spencer's claims against the individual defendants all fail for the same reasons.

[11]   Though no summons has been issued or served upon the individual defendants, LabCorp has submitted its motion to dismiss pursuant to Rule 12(b)(6) on behalf of all defendants to avoid piecemeal litigation. (See Def's. Mot. at 6, n.1.) Because the Court dismisses the complaint for failure to state any claims for which relief may be granted, the issue of service of summons on the individual defendants is moot.

where the contracting party, in failing to exercise reasonable care in the performance of his duties, launches a force or instrument of harm.  Id. (citing Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136, 140 (2002)).  Pursuant to this exception, the New York Court of Appeals has held that a laboratory has "a duty to the test subject to perform his drug test in keeping with relevant professional standards," despite the lack of a contractual relationship.  Landon v. Kroll Laboratory Specialists, Inc., 22 N.Y.3d 1, 6-7 (N.Y. 2013).  This duty is "limited to 'th[o]se circumstances'— namely, a drug laboratory's failure to adhere to professionally accepted scientific testing standards in the testing of the biological sample."  Pasternack v. Laboratory Corp. of Am. Holdings, 27 N.Y.3d 817, 826-27 (2016) (quoting Landon, 22 N.Y. 3d at 7).

In Landon, the plaintiff alleged that the laboratory falsely reported that he had tested positive for THC in connection with a toxicology test that failed to adhere to federal and manufacturer cutoff standards and state confirmatory testing requirements.  Id. at 5.  The Landon Court held that despite the absence of a contract between the plaintiff and defendant, the laboratory owed a duty of care to test the plaintiff's biological sample "in keeping with relevant professional standards."  Id. at 6-7.  The court reasoned that there were strong public policy considerations for finding a duty under those circumstances because a false positive test result could have "profound, potentially life-altering consequences for a test subject."  Id. at 6.

Three years after Landon, the Court of Appeals, in Pasternack v. Laboratory Corp. of Am. Holdings, clarified when laboratories and program administrators owe a duty, explaining that liability "does not encompass every step of the testing process" and that violating federal testing regulations "unrelated to the actual performance of scientific testing" is not alone sufficient to create liability.  27 N.Y.3d 817, 826 (N.Y. 2016).  Rather, a laboratory's duty of care is "limited to 'th[o]se circumstances'—namely, a drug laboratory's failure to adhere to professionally

15

accepted scientific testing standards in the testing of the biological sample." Id. (declining "to extend Landon's reasoning to impose a duty upon a laboratory to test subjects that requires the laboratory to adhere to aspects of the federal regulations and guidelines that do not implicate the scientific integrity of the testing process.") (quoting Landon, 22 N.Y. 3d at 7.)

The SAC alleges that LabCorp owed Spencer a duty of:

> providing feedback to plaintiffs concerns of a false positive hair follicle test, providing and or referring plaintiff to get a litigation package regarding a false positive hair follicle test. However, defendants breached duty owed to plaintiff when defendants failed to provide services that would protect plaintiff from harm and as a result plaintiff was harmed.

(SAC ¶ 105.)

The SAC also alleges that LabCorp failed to:

> properly train employees, have sufficient chain of custody to prevent a tampered hair specimen and or phony hair test report, check for broken chain of custody to track hair specimen, have records to confirm all scientific procedures of a hair follicle test, disclose material facts, disclose known fraudulent activities, manage records properly, ensure that litigation packages are sufficient, ensure that policies are fulfilled, ensure that specimens are properly handled/properly stored, engage in quality assessment activities and protect plaintiff from a false cocaine positive test.

(SAC 106; see also SAC ¶ 110.)

Here, the record indicates that LabCorp acted as the TPA and did not actually perform the testing at issue. The Court assumes that LabCorp owed a duty of care to Spencer to the extent that LabCorp was itself involved in aspects of Spencer's test that "implicate[d] the scientific integrity of the testing process." As explained below, Spencer has not plausibly alleged that LabCorp breached that duty.

Moreover, even assuming, for the sake of argument, that LabCorp, as the TPA, could potentially be responsible for negligence committed by Psychemedics, Spencer also fails to plausibly allege that Psychemedics breached its duty of care.

In the specific circumstances of this case, Spencer's conclusory allegations of negligence are insufficient to allege a plausible negligence claim.  (SAC ¶¶ 105–06, 158–59.)  Moreover, the specific factual allegations set out in the SAC and relied on by Spencer in his opposition brief do not render his negligence claims plausible.

Additionally, as explained below, even if Spencer could plausibly allege duty and a breach, his negligence claims would still fail because he has not alleged any cognizable harm.  While Spencer contends that he lost his parental rights because of the August 28 positive test, he has not plausibly alleged that his August 28 hair test was the proximate cause of the Family Court's adverse rulings that post-date the August 28 hair test.  The Family Court never learned of (or relied on) this positive hair test.  Spencer's allegation that the August 28 false positive result caused him to refuse to submit to subsequent court-ordered drug testing is insufficient to establish proximate cause.  Finally, Spencer's claims that he suffered emotional distress as a result of the August 28 hair test also fail because Spencer has not plausibly alleged the necessary elements for negligent infliction of emotional distress.

### 2.  Spencer's Allegations that He Does Not Use Drugs Do Not Render His Claims Plausible

Spencer insists that both he and Cooley do not use drugs and that, as such, his August 28 hair test was a "false" positive and must have been negligently conducted or have been outright "fraudulent."  However, Spencer's allegations that the Parents do not use drugs are, given all the circumstances and allegations here, insufficient to plausibly allege that the tests at issue were negligently administered or fraudulent.  See Velez v. Microgenics Corp., No. 20-CV-387, 2020 WL 4043240, at *3 (W.D.N.Y. July 16, 2020) (finding plaintiff failed to allege negligence claim where he alleged that drug test "produced a false positive test," identified "a list of the steps at which Defendants could have made errors" and included "conclusory claims of a breach of duty");

17

Spencer v. Eac Network, 2021 N.Y. Misc. LEXIS 14609, at *7; cf. Sagraves v. Lab One, Inc., 316 F. App'x 366, 371 (6th Cir. 2008) ("Plaintiff cites his signed affidavit, stating that he has never used cocaine. This affidavit, however, is merely an assertion, not competent evidence demonstrating that [the defendant laboratory] violated a duty of care.").

Spencer's negligence and fraud claims are particularly implausible here given the sheer number of positive test results that have been reported for him, Cooley, and even one of their children. Not only did Omega report that Spencer tested positive in November 2017, but Omega also reported that both of Spencer's hair tests in September 2018 were positive for cocaine. Spencer took these two Omega hair tests less than a month after the August 28 hair test that he challenges here. Spencer's allegations that all four of these tests were hair tests were fraudulent or negligently administrated are simply not plausible.[12]

### 3. Spencer's Negative Urine Tests Do Not Render His Claims Plausible

Spencer's negative urine tests have little probative value because they involved a different type of test on a different biological specimen. Cf. Bass, 318 So. 3d at 921 ("[T]he results of a different lab test on a different type of biological sample does not create a genuine issue of material fact as to whether the results of Psychemedics's thrice-confirmed positive hair sample drug test results were inaccurate due to any negligence on Psychemedics's part. Simply showing the presence of disputed or conflicting facts (here, a negative urine test vs. a positive hair sample test) is insufficient if there is no legal issue presented by those contested facts."). Spencer's negative urine tests do not plausibly suggest that LabCorp acted negligently concerning the August 28 hair test.

---

[12] In the Omega decision, the Court explained that Spencer failed to plausibly allege that Omega acted negligently in connection with Spencer's three positive hair tests.

**4.   Purported Discrepancies and Omissions in Testing Documentation Do Not Plausibly Suggest that LabCorp Was Negligent or Produced "Fraudulent" Documentation**

In support of both his negligence and fraud claims, Spencer points to purported discrepancies, omissions, and irregularities in various testing documents.  As explained below, none of these points plausibly suggest fraud or even negligence.

Spencer asserts that the "Laboratory Copy" of the CCF contained in the litigation package for his August 28 hair rest is missing his "split B initial" and that this omission suggests negligence (or even outright fraud).  (Id. ¶ 41.)  This argument is meritless.

The bottom of the "Laboratory Copy" of this CCF appears to contain a seal that was to be utilized when the test at issue involved split specimens (namely, an "A" specimen and a "B split" specimen).  The "B split" seal on this CCF does not contain Spencer's initials in the space provided for such initials.  However, the litigation package for the August 28 hair test contains a picture of the related seal for the "A" specimen that contains Spencer's initials and was located on specimen pouch.  The SAC admits that Spencer printed his initials on this sealed specimen pouch.

While Spencer's initials are, admittedly, not found on the "B split" seal on the Laboratory Copy of the CCF, the SAC does not allege that Spencer's hair test involved a split specimen or was even supposed to involve a split specimen.[13]  As such, the fact that Spencer did not initial the seal that would be utilized for a "split B" specimen is immaterial and does not plausibly suggest negligence by LabCorp or any other party.

---

[13]  By contrast, Spencer has provided the litigation package for the August 17, 2018 urine test he took for the TLC.  The CCF for that urine test explicitly states that it involved a "split specimen collection."  (SAC, Ex. 4.)  It is also notable that the CCF for Spencer's August 18 urine test does not include a "Split B" seal on the CCF, presumably because that seal was removed from the CCF and affixed to the "Split B" specimen.  The SAC does suggest otherwise.

Spencer has not plausibly alleged that, given the specific hair test Spencer purchased, Rabu should have required Spencer to place his initials on the "split B" specimen.  Relatedly, Spencer has also not plausibly alleged that the absence of his initials on that "split B" specimen seal "implicated the scientific integrity of the tests performed by" Psychemedics.  <u>Spencer v. Eac Network</u>, 2021 N.Y. Misc. LEXIS 14609, at *7.

The Court also notes that the SAC's negligence allegations concerning the "missing" Split B initials are nonsensical.  The SAC alleges that "based on plaintiff's initials being missing from split B donor's space on the laboratory chain of custody. . . it appears that plaintiff was misled and didn't give consent for his hair specimen to be shipped to or to [have the testing] performed by anywhere else other than [LabCorp]."  (SAC ¶ 99.)

Spencer's opposition brief also states that he was confused by the "Laboratory Copy" which contained the "Split B" section because this "Split B" section did not appear on either the "Collector Copy" or "Donor Copy" of the CCF.  The SAC, however, does not allege that such seals are ordinarily found on the "Donor Copy" or the "Collector Copy" of CCF used by LabCorp.  As noted earlier, Spencer admits that he signed the seal for the "A" specimen found on the specimen pouch for his August 28 hair test.

The missing initials on the "Split B" specimen seal do not plausibly allege negligence by

LabCorp or any other party.[14]

The other arguments raised in Spencer's opposition brief concerning the CCFs also do not plausibly suggest negligence.  In his opposition brief, Spencer asserts, inter alia, that the litigation package for the August 28 test contains a "contradicted chain of custody that only includes Labcorp locations on the chain of custody and does not bare any information about [Psychemedics]."  (Pl. Opp'n at 5.)  Spencer also asserts that there is not anything on the chain of custody forms "regarding [Psychemedics] having any involvement with plaintiff's hair sample collection on 8-28-18."  (Id. at 5.)

With respect to the latter argument, LabCorp and Psychemedics have never claimed that Psychemedics was involved in Spencer's hair sample collection on August 28—that collection was performed by Rabu.  As for the former argument, Spencer is correct that the name "Psychemedics" does not appear on the "Laboratory Copy" of the CCF in the litigation package.  However, that does not plausibly suggest negligence.  The "Received at Lab" section of the CCF indicates that the seal of the specimen was intact and includes the name and signature of "Jose Cruz."  (SAC, Ex. 3 at 09.)  Psychemedics' internal chain of custody form similarly indicates that "Jose C" was the individual who "Received, Opened, Accessioned, and Transferred Samples to

---

[14]   Rabu—and not LabCorp—collected Spencer's specimen and was tasked with ensuring that he filled out any necessary information on the CCF.  When a separate entity collects the sample from the donor, a testing laboratory is ordinarily not liable for alleged negligence by a collector.  See Santiago v. Greyhound Lines, Inc., 956 F. Supp. 144, 155 (N.D.N.Y. 1997); Bass v. DISA Glob. Sols., Inc., 2020-0071, 318 So. 3d 909, 920 (La. App. 1 Cir. Dec. 30, 2020) (holding, under Louisiana law, that laboratory was not responsible for actions of independent third-party collector where there was no evidence that the laboratory "exercised control over [collector's] employees regarding the hair sample drug testing collection process"), writ denied, 2021-00147, 313 So.3d 273 (La. Mar. 23, 2021).

Here, the SAC does not plausibly allege that LabCorp controls Rabu.  It is not clear to what extent a laboratory or TPA has a duty under New York law to review chain of custody documents for irregularities or when such a duty would require a laboratory or TPA to reject a sample or test results.  However, even assuming that such a duty exists, Spencer has not plausibly alleged that LabCorp acted negligently and breached any such duty here.  See Santiago, 956 F. Supp. at 155 (assuming, for the sake of argument, that laboratory had duty to examine portion of chain of custody form filled out by collector for irregularities, but granting summary judgment to laboratory because alleged irregularities were too "innocuous" to indicate negligence and laboratory's failure to detect signature forged by collector was not negligent).

Temporary Storage." (SAC, Ex. 3 at 09.) The SAC and Plaintiffs' opposition brief say nothing about this individual and never allege that he was not an employee of Psychemedics. Contrary to Spencer's contention, the fact that Psychemedics is not listed by name on the CCF does not plausibly allege negligence by LabCorp or any other party concerning the chain of custody.

Finally, none of the other purported examples of negligence cited in the SAC plausibly allege a negligence claim against LabCorp. (SAC ¶¶ 99–103.) For example, the SAC alleges that LabCorp was negligent because Spencer's "donor copy" of the CCF led him to believe that LabCorp would be performing the test and the "donor copy" of the CCF did not indicate that his specimen would be shipped to Psychemedics. (SAC ¶ 98.) The fact that Psychemedics performed this testing for LabCorp—which also occurred for Cooley's January 2019 test that was reported as negative—does not suggest negligence. Moreover, the fact that Spencer was not told that Psychemedics would ultimately perform the test does not plausibly suggest that the scientific integrity of the testing was compromised.[15]

For the reasons set forth above, Spencer has not plausibly alleged that Omega acted negligently in connection with the August 28 hair test.

### 5. Spencer Has Not Plausibly Alleged that His August 28 Hair Test Proximately Caused Him Any Cognizable Harm or is a Basis for a Plausible Negligent Infliction of Emotional Distress Claim

Spencer's negligence claim also fails because the SAC does not: (1) plausibly allege that his August 28 hair test proximately caused the loss of his parental rights; or (2) plausibly allege claims for negligent infliction of emotional distress premised on the August 28 test.

---

[15] With respect to this and other purposed discrepancies raised by Spencer, it is notable that although Psychemedics was also involved in Cooley's January 2019 negative hair test, Spencer's pleadings do not include a copy of the CCF or the litigation package for Cooley's January 2019 hair test. More importantly, Spencer does not allege that the CCFs and other documents found in the litigation packet for his August 2018 hair test differed, in any material respects, from the analogous documentation for Cooley's January 2019 negative hair test, which Spencer maintains was accurate.

Spencer's negligence claim concerning his August 28 hair test is different from the type of claims plaintiffs typically raise when alleging negligent drug testing.  Usually, a plaintiff will allege that:  (1) a third party (such an employer, a court, etc.) required the plaintiff to undergo a drug test; (2) the negligence of a laboratory or collector in connection with the test caused a false positive result; and (3) the third party decided to take some adverse action against the plaintiff, such as terminating their employment, based on the allegedly false positive drug test.  See, e.g., Landon, 22 N.Y.3d at 6-7; Santiago v. Greyhound Lines, Inc., 956 F. Supp. 144, 153 (N.D.N.Y. 1997).  The SAC, however, does not allege that the Family Court ever learned about (or relied on) the results of the August 28 hair test, which Spencer voluntarily obtained at his own expense.

Spencer nevertheless alleges that the August 28 positive test result "hindered" him from obtaining custody of his children and that the August 28 positive test "resulted" in Spencer "losing his parental rights from September 1, 2018 to July 17, 2019." (SAC ¶ 111.)  According to Spencer, the false positive result for the August 28 hair test was the reason why he refused to take later hair tests that were ordered by the Family Court.  Specifically, Spencer alleges that:  (1) he intended to use the August 28 test to dispute any "false positive test in Family Court"; and (2) because the August 28 test was itself a "false positive," and he could not use the August 28 test to protect himself from a false positive test in Family Court, he refused to take subsequent hair tests ordered by the Family Court.  (SAC ¶ 119.)  That refusal resulted in the Family Court drawing adverse inferences against him.  (See SAC ¶ 164.)

Spencer, however, has not plausibly alleged that the positive August 28 hair test result proximately caused the loss of his parental rights.

Generally, proximate cause—which is sometimes referred to as "legal cause"—is a fact question; however, there are certain instances when proximate cause "may be decided as a matter

of law." <u>Derdiarian v. Felix Contracting Corp.</u>, 51 N.Y.2d 308, 315, 414 N.E.2d 666, 670 (N.Y. 1980).  "An intervening act of the plaintiff or of a third-party may serve to limit or extinguish the defendant's liability." <u>Carson v. Dudley</u>, 25 A.D.3d 983, 984, 807 N.Y.S.2d 458, 459–60 (N.Y. App. Div. 3d Dep't 2006).  "[A]n intervening act will be deemed a superseding cause and will serve to relieve defendant of liability when the act is of such an extraordinary nature or so attenuates defendant's negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant." <u>Id.</u> (quoting <u>Kush by Marszalek v. City of Buffalo</u>, 59 N.Y.2d 26, 33, 449 N.E.2d 725 (N.Y. 1983)).

To the extent that Spencer's refusal to take court-ordered hair tests adversely affected his parental rights, those refusals (and the adverse inferences the Family Court drew against him based on those refusals), were not proximately caused by the August 28 hair test.  On October 15 and October 25, Spencer and Cooley appeared in Family Court and were directed to submit to hair tests.  They refused, which resulted in the Family Court drawing an adverse inference against them.[16]  Rather than taking advantage of these opportunities to establish that he was not using cocaine—which Spencer insists was the case—Spencer refused to take additional hair tests.  Any adverse consequences Spencer suffered in Family Court were the direct result of his "extraordinary" refusal to submit to those court-ordered hair tests.  The Family Court's independent decision to draw an adverse inference against him is also a further reason why proximate cause is lacking.  Even assuming that the August 28 private hair test was negligently performed, Spencer has not plausibly alleged that this negligence was a proximate cause of any adverse consequences he suffered in Family Court.  See <u>Sagraves v. Lab One, Inc.</u>, 316 F. App'x

---

[16]  According to the Omega Complaint, after Spencer refused to submit to the test on October 15, the Family Court drew an adverse inference against him.  When the Family Court subsequently ordered Spencer to submit to a hair test on October 25, he again refused.

366, 371 (6th Cir. 2008) (finding that plaintiff's termination was not proximately caused by a drug test that was allegedly negligently performed because, <u>inter alia</u>, after the drug test, plaintiff had agreed with employer that he would complete drug treatment program as part of "Last Chance" agreement, and plaintiff failed to complete the program); <u>cf. Braverman v. Bendiner & Schlesinger, Inc.</u>, 121 A.D.3d 353, 372, 990 N.Y.S.2d 605, 620 (2014) (Dickerson, J. (concurring)) (finding that proximate cause was lacking as matter of law for plaintiff's claim based on laboratory's alleged negligence in connection with drug test in drug treatment court).

Spencer also claims that he suffered from various forms of emotional distress as a result of the August 28 test.  However, none of this alleged emotional distress is a basis for a viable claim.

While Spencer alleges that he suffered emotional distress as a result of the loss of his parental rights, (SAC ¶ 113), he does not have a viable negligence claim premised on that emotional distress because, as explained above, Spencer's loss of parental rights was not proximately caused by the August 28 hair test.

To the extent Spencer alleges that he suffered other forms of emotional distress as a result of the August 28 hair test, Spencer has not plausibly alleged a claim for negligent infliction of emotional distress.[17]  Unlike in the Omega Case, where the Parents brought a separate claim for negligent infliction of emotional distress, no such claim was actually pled here.  However, the remaining aspects of Spencer's negligence claim—which seek recovery solely based on emotional distress—are appropriately analyzed as claims for negligent infliction of emotional distress.

---

[17]  The instant case is distinguishable from <u>Landon v. Kroll Laboratory Specialists, Inc.</u>, 22 N.Y.3d 1, 7–8 (2013), where the plaintiff's probation was extended as a result of an allegedly negligent drug test.  In <u>Landon</u>, the Court of Appeals found that the plaintiff had sufficiently alleged a cognizable harm based on his alleged "loss of freedom occasioned by the extension of his probation"—which was a direct result of the negligent drug test—as well as the "emotional and psychological harm" that resulted from that loss of freedom.  In <u>Landon</u>, it was not disputed that the negligent drug test was a proximate cause of both the plaintiff's loss of freedom and the resulting emotional harms that flowed from that loss of freedom.

According to the SAC, the August 28 hair test result caused Spencer: (1) severe emotional distress; (2) flashbacks; (3) to fear drug tests; and (4) to be "triggered" whenever he has to perform his annual drug test for his TLC license. (SAC ¶¶ 115–122.) The August 28 hair test also allegedly caused Spencer and Cooley to have "relationship problems" and arguments. (SAC ¶¶ 115–122.) Spencer also claims that the August 28 test resulting in him not working due to the severe emotional distress caused by the test. (Id.)

To state a claim for negligent infliction of emotional distress under New York law, a plaintiff must plausibly allege: "(1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." Francis v. Kings Park Manor, Inc., 992 F.3d 67, 81 (2d Cir. 2021). The causation element requires the plaintiff to plausibly allege that the mental injury was "a direct, rather than a consequential, result of the [negligence]." Taggart v. Costabile, 131 A.D.3d 243, 253, 14 N.Y.S.3d 388 (N.Y. App. Div. 2d Dep't 2015) (quoting Kennedy v McKesson Co., 58 N.Y.2d 500, 506 (N.Y. 1983)). The "guarantee of genuineness" requirement "may be satisfied where the particular type of negligence is recognized as providing an assurance of genuineness." Id. Courts, however, have recognized only a limited number of such circumstances, including "the mishandling of a corpse or the transmission of false information that a parent or child had died. Id.; see also Ornstein v. N.Y.C. Health & Hosps. Corp., 852 N.Y.S.2d 1, 3 (N.Y. 2008) (recognizing claim where plaintiff alleged emotional distress arising from negligent exposure to HIV); see also Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir. 2000) (finding that negligently misdiagnosing a plaintiff with HIV was likely to constitute a special circumstance to allow for the recovery of purely emotional harm). When such "such specific circumstances" are absent, "the guarantee of genuineness 'generally requires that the breach of the

duty owed directly to the injured party must have at least endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her own physical safety.'" Taggart, 131 A.D.3d at 253; see Calicchio v. Sachem Cent. Sch. Dist., 185 F. Supp. 3d 303, 315 (E.D.N.Y. 2016) (dismissing claim for negligent infliction of emotional distress "given the absence of facts which plausibly assert that plaintiff's physical safety was endangered or that he plausibly feared for his physical safety").

Here, Spencer's allegations—which do not involve dangers or fears of physical harm—lack the requisite guarantee of genuineness. See Spencer, 2020 WL 7024381, at *7 (finding Spencer failed to plead the requisite "guarantee of genuineness" in claim against Psychemedics); Spencer v. Eac Network, 2021 N.Y. Misc. LEXIS 14609, at *6 (dismissing the Parents' negligent infliction of emotional distress claim because "the alleged conduct of the EAC defendants did not endanger the plaintiffs' safety"); Calicchio, 185 F. Supp. at 315; Drake v. Laboratory Corp. of Am. Holdings, No. 02-CV-1924, 2007 WL 776818, at *5 (E.D.N.Y. Mar. 13, 2007) (dismissing negligent infliction of emotional distress claim concerning drug test where plaintiff failed to "allege that defendants' negligence resulted in a threat of physical harm, or that defendants' breach of duty endangered his physical safety"). Accordingly, any potential claim for negligent infliction of emotional distress fails.

Spencer's claim that the August 28 hair test results caused arguments and relationship problems with Cooley also fails for the additional reason that Spencer has not plausibly alleged that any such emotional distress was a "direct, rather than a consequential, result" of the alleged breach.

Finally, Spencer claims that the August 28 hair test caused him to suffer $150,000 in lost wages.  (SAC ¶ 116.)  Spencer, however, does not claim that any employer learned about (or relied

on) the August 28 hair test.  Rather, Spencer simply alleges that he was unable to work for "NYC Taxi-Limo or in the Commercial Driving Industry" because he was in "severe emotional distress" from the August 28 hair test.[18]  This is just another variation of a negligent infliction of emotional distress claim.  Accordingly, Spencer must plausibly allege the requisite elements for such a claim, which he has failed to do.

For all of the reasons set out above, plaintiff fails to allege a plausible negligence claim.

## C. **Fraud Claims**

Under New York law, to plead common law fraud, plaintiff must allege: "(1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury." Premium Mortg. Corp. v. Equifax Info. Servs., LLC, 583 F.3d 103, 108 (2d Cir. 2009) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421 (N.Y. 1996)).  Additionally, to establish fraudulent concealment, under New York law, a plaintiff must also allege that the defendant had a duty to disclose the material information and that it failed to do so.  P.T. Bank Cent. Asia v. ABN AMRO Bank N.V., 301 A.D.2d 373, 376 (1st Dep't 2003).

An essential element of any fraud . . . claim is that there must be reasonable reliance, to a party's detriment, upon the representations made."  Spencer, 2020 WL 7024381, at *5 (quoting Sears Road Realty Corp. v. Exxon Mobil Corp., No. 09-CV-889, 2012 WL 4174862, at * 12 (E.D.N.Y. Sept. 18, 2012).  "'[P]laintiff must show both that defendant's misrepresentation

---

[18]  While the SAC alleges that the drug tests required for Spencer's TLC license "triggered" him, he does not explicitly allege that he actually refused to take the TLC drug tests.  (SAC ¶ 117.)  Moreover, the August 28 hair test would not be considered a proximate cause of any refusal by Spencer to take a TLC-required drug test.  The Court also notes that the Omega Complaint identifies various urine tests Spencer took between March 7, 2019 and May 29, 2019 for his Family Court proceedings–all of those tests were after the August 28, 2018 hair test.  (Omega Compl., Ex. D, Omega Compl. ¶ 47.)

induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation).'" Id. (quoting Sears, 2012 WL 4174862, at *12 (quoting Laub v. Faessel, 297 A.D.2d 28, 31, 745 N.Y.S.2d 534 (N.Y. App. Div. 1st Dep't 2002)).

Further, Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") requires that a party alleging fraud or fraudulent concealment "must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); see Hinds County, Miss. v. Wachovia Bank N.A., 620 F.Supp.2d 499, 520 (S.D.N.Y. 2009) ("A claim of fraudulent concealment must be pled with particularity, in accordance with the heightened pleading standards of Fed. R. Civ. P. 9(b).")). To satisfy Rule 9(b), a plaintiff alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). Similarly, a plaintiff alleging fraudulent concealment must specify: "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." Spinnato v. Unity of Omaha Life Ins. Co., 322 F. Supp. 3d 377, 398 (E.D.N.Y. 2018 (quoting Malmsteen v. Berdon, LLP, 477 F. Supp. 2d 655, 664–65 (S.D.N.Y. 2007)).

Spencer alleges, in conclusory fashion, that LabCorp committed fraud because the testing services it provided were not "genuine," (SAC ¶¶ 84, 89, 127, 128, 129), the September 1 LabCorp Report is "inauthentic" and "phony," (SAC ¶¶ 50, 85, 95), and the litigation package produced by Psychemedics is "fraudulent," (SAC ¶¶ 50, 128, 87–92.) These conclusory allegations do not allege plausible fraud claims.

The SAC also fails to plausibly allege fraudulent intent.  A fraud claim requires a plaintiff "to allege facts that give rise to a strong inference of fraudulent intent." In re Carter-Wallace, Inc., Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (quoting Shields v. Citytrust Bancorp, 25 F.3d 1124, 1128 (2d Cir. 1994)).  "[C]onclusory and legal allegations, devoid of particularized facts giving rise to an inference of scienter, are insufficient to meet Plaintiffs' burden under Rule 9(b).)" Hesse v. Godiva Chocolatier, Inc., 463 F. Supp. 3d 453, 473 (S.D.N.Y. 2020).  Rule 9(b) does not grant an aggrieved party "license to base claims of fraud on speculation and conclusory allegations." Shields, 25 F.3d at 1128.  A plaintiff may be able to plausibly allege fraudulent intent "through allegations of a motive to deceive and access to accurate information." Cohen v. Koenig, 25 F.3d 1168, 1173–74 (2d Cir. 1994) (cleaned up).

Here, the SAC is devoid of any plausible allegations that LabCorp had a motive to deceive Spencer and to provide him with intentionally incorrect test results on a "phony" lab report. LabCorp had no involvement in Spencer's Family Court proceedings and LabCorp's only prior interaction with Spencer appears to have been his August 17, 2018 urine test for the TLC, which LabCorp reported as negative.  Shortly thereafter, Spencer paid for the August 28 private hair test, and Rabu collected his hair sample for this test.  LabCorp had no interest in the outcome of this test or motive to falsify the results on the September 1 LabCorp Report.  In addition to Spencer's August 17, 2018 negative urine test, LabCorp also reported Cooley's January 2019 hair test result as negative.  The notion that LabCorp had a motive to provide intentionally false test results to Spencer for this one hair test is, given the record here, not plausible.

Spencer's fraud claims also fail for other reasons.  The SAC and Spencer's opposition brief focus on the $150 he paid for the August 28 hair test and the $250 he later paid for the accompanying litigation package.  (SAC ¶¶ 129–133.)

Spencer appears to assert that LabCorp defrauded him out of the $150 he paid for the August 28 hair test because it did not provide "genuine" testing services.  As noted above, Spencer's conclusory allegations that LabCorp's services were not "genuine" is insufficient to plausibly allege fraud.  Moreover, Spencer never alleges that LabCorp made any representations to him when he purchased the hair test on August 28.  Rather, Spencer dealt exclusively with Rabu. Spencer has also not alleged that the identity of the laboratory performing the test was material to him.  He originally sought to obtain a test from Omega and then chose LabCorp to perform the test after being told by Rabu that LabCorp performs the same tests as Omega.  (SAC ¶ 66.)  It is also notable that Cooley went to LabCorp for a hair test in January 2019—this was after Spencer had already received the litigation package for his August 28 hair test, which made clear that Pyschemedics performs hair testing for LabCorp.

Spencer also alleges that LabCorp defrauded him into paying $250 for the litigation package because Cyrus told him that the litigation package would "pull everything that happened at the lab."  (SAC ¶ 36.)  Again, Spencer's conclusory allegations that this litigation package was "fraudulent" are not plausible.  Moreover, the SAC admits that Psychemedics—and not LabCorp—created the litigation package.  (SAC ¶ 90.)  Spencer's conclusory allegations that LabCorp and Psychemedics conspired to produce this "fraudulent" litigation package are not plausible.  (See SAC ¶¶ 84, 89); see Milk Wagon Drivers & Dairy Employees v. Elmhurst Daily, Inc., 14 F. Supp. 3d 90, 98 (E.D.N.Y. 2014) ("A conclusory allegation of the existence of a conspiracy, however, is a legal conclusion not entitled to the presumption of truth and is therefore insufficient to state a plausible claim.") (citing Twombly, 550 U.S. at 556–57.)

Spencer's opposition brief also asserts that he has a viable fraud claim based on Cyrus's November 1, 2018 statement to him that the three tests listed on the September 1 LabCorp Report

were "performed/reported."  A few weeks later, a different LabCorp employee told Spencer that one of the listed tests was an old test code that LabCorp no longer performed.  (SAC ¶ 42.)  This claim fails because, <u>inter</u> <u>alia</u>, the SAC does not plausibly allege that Spencer relied on Cyrus's alleged misrepresentation to his detriment.

Spencer has also not plausibly alleged that he relied, to his detriment, on LabCorp's allegedly "phony" positive test result.  Spencer did not submit the August 28 test result to the Family Court.  The SAC never identifies how Spencer relied, to his detriment, on the allegedly false positive test result.  <u>See also</u> <u>Spencer</u>, 2020 WL 7024381, at *5.

Additionally, to the extent Spencer's fraud claims are premised on him suffering emotional distress from the alleged fraud—rather than on pecuniary harm sustained as a result of the fraud—such claims fail as a matter of law.  <u>See</u> <u>Spencer v. Rabu Diagnostic Servs.</u>, 2020 N.Y. Misc. LEXIS 44501, at *5.

Finally, Spencer's fraudulent concealment claim is, for many of the same reasons, also not plausible.  Furthermore, Spencer has not plausibly alleged what specific information LabCorp concealed and should have disclosed.  Spencer appears to allege that LabCorp committed fraud by not disclosing that it had acted negligently with respect to the August 28 hair test.  However, as explained previously, Spencer has not plausibly alleged that LabCorp acted negligently.

For reasons set out above, Spencer has failed to plead a claim for fraud or fraudulent concealment, much less with the particularity required by Federal Rule 9(b).  Accordingly, his fraud claims are dismissed.

**D.  <u>Intentional Infliction of Emotional Distress Claim</u>**

Under New York law, a claim of intentional infliction of emotional distress requires: "'(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial

probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.'" Conboy v. AT & T Corp., 241 F.3d 242, 258 (2d Cir. 2001) (quoting Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999)).  "[I]ntentional infliction of emotional distress is a highly disfavored [tort] under New York law," Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 158 (2d Cir. 2014)), and it is "to be invoked only as a last resort," id. (quoting McIntyre v. Manhattan Ford, Lincoln–Mercury, Inc., 682 N.Y.S.2d 167 (App. Div. 1998)); Sesto v. Slaine, 171 F. Supp. 3d 194, 201-02 (S.D.N.Y. 2016) (intentional infliction of emotional distress claims are "routinely dismissed on pre-answer motion.")

To satisfy the first element of an intentional infliction of emotional distress claim, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Conboy, 241 F.3d at 258 (quoting Howell v. New York Post Co., 81 N.Y.2d 115, 122 (1993)). "Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." Sesto, 171 F. Supp. 3d at 201 (quoting Stuto, 164 F.3d at 827) (affirming dismissal of an intentional infliction of emotional distress claim on a Rule 12(b)(6) motion where the plaintiff failed to allege conduct that was sufficiently extreme and outrageous).  Even "[a]ctions 'likely [to] be considered reprehensible by most people' are not sufficient." DiRuzza v. Lanza, 685 F. App'x 34, 37 (2d Cir. 2017) (summary order) (citing Chanko v. Am. Broad. Cos., 27 N.Y.3d 46, 57 (2016) ("[n]oting that 'the requirements . . . are rigorous, and difficult to satisfy,' we have commented that, 'of the intentional infliction of emotional distress claims considered by this Court, every[]one has failed because the alleged conduct was not sufficiently outrageous'") (quoting Howell, 81 N.Y.2d at 122) (internal quotation marks and citations omitted and emphasis added).

The Court has already explained why Spencer has failed to plausibly allege fraud and negligence claims.  For many of the same reasons, Spencer's IIED fails as well.

For example, Spencer's allegations that LabCorp intentionally falsified Spencer's test results and produced a "phony" report for his positive results are conclusory and not plausible.  See Keane v. Keane, No. 08-Civ.-1375, 2010 WL 2900258, at *3 (S.D.N.Y. July 20, 2010) (dismissing intentional infliction of emotional distress claim where plaintiff's allegations were insufficiently vague and conclusory); Swanson v. City of New York, No. 16-CV-3231, 2017 WL 3130322, at *16 (E.D.N.Y. July 21, 2017) (finding that plaintiff failed to plead a claim for intentional infliction of emotional distress because her allegations were wholly conclusory and failed to allege facts from which the court could infer that defendants intended to cause, or recklessly disregarded the risk of causing, severe emotional distress.)

Moreover, Spencer has failed to plausibly allege that LabCorp even acted negligently.  In light of that conclusion, the Court fails to see how his IIED claim can possibly succeed.  See Spencer, 2020 WL 7024381, at *6 (finding the defendant's testing and reporting of a hair specimen it received from LabCorp with a chain of custody form that was missing a second set of plaintiff's initials was not extreme and outrageous conduct); cf. Spencer v. Eac Network, 2021 N.Y. Misc. LEXIS 14609, at *5 (Sup. Ct. Sep. 24, 2021) (dismissing intentional infliction of emotional distress "because the misconduct ascribed to the EAC defendants, consisting mainly of administrative errors, cannot be considered so outrageous as to support such an action").  Of course, even if Spencer had plausibly alleged that LabCorp was negligent that alone would be insufficient to allege an IIED claim.  Moreover, the notion that LabCorp intended to cause Spencer emotional distress is, given the allegations here, simply not plausible.

Spencer has failed to allege the requisite intent or conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Conboy, 241 F.3d at 258.

## E. Leave to Amend

"A pro se plaintiff should ordinarily be given the opportunity 'to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.'" Shomo v. City of New York, 579 F.3d 176, 183 (2d Cir. 2009) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795–96 (2d Cir. 1999) (internal quotation marks omitted)). "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons. Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). "Where it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993).

While amendments to pro se complaints are generally granted "fairly freely," even pro se litigants are not entitled to unlimited opportunities to amend their pleadings. Holmes v. Goldin, 615 F.2d 83, 85 (2d Cir. 1980) (citation omitted); Best v. City of N.Y., No. 12-CV-7874, 2014 WL 163899, at *3 (S.D.N.Y. Jan. 15, 2014). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." Kim v. Kimm, 884 F.3d 98, 105 (2d Cir. 2018) (quotation marks omitted).

The Court has carefully considered whether leave to amend is warranted here. The SAC does not suggest that valid claims might be stated by Spencer. Additionally, Spencer has already filed two amended complaints. Spencer has filed five lawsuits stemming from the drug tests

connected to the Family Court proceeding and has had ample opportunities to allege plausible claims.  Given all of the above, the Court denies leave to amend.

### III.  CONCLUSION

For the reasons stated above, the Court grants Defendants' motion to dismiss and dismisses the SAC with prejudice.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that, should Spencer seek in forma pauperis status for the purpose of an appeal, any appeal from this order would not be taken in good faith and therefore in forma pauperis status is denied.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is directed to close this case and to mail a copy of this order to the pro se Plaintiff.

**SO ORDERED.**

_____/s/(JMA)_____

Dated:  August 6, 2024                          Joan M. Azrack
Central Islip, New York                      United States District Judge